| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| | ) | |
| v. | ) | No. 3:22-cr-00013 |
| | ) | JUDGE CRENSHAW |
| BRANDIE NICOLE APPLETON | ) | |

## SENTENCING MEMORANDUM FOR BRANDIE APPLETON

Through counsel, Brandie Nicole Appleton asks the Court to impose a sentence that reflects her impressive rehabilitation and enables her to keep fighting for custody of her daughter. The guidelines range of 41 to 51 months over-represents Ms. Appleton's culpability because it relies on criminal history points for very minor crimes, many of which were committed when she was still a teenager. Mr. Appleton's trauma history, the addiction-triggered nature of her crime, and the inflation of her criminal history category justify a significant downward variance. Her extraordinary rehabilitation and fight for her children merit a non-custodial sentence.

## BACKGROUND

Today, Brandie Appleton is sober, working a full-time job, supporting herself, actively parenting her children, and fighting to regain custody of her elder daughter. Today, Brandie Appleton is a different person from who she was in April 2021, when she committed this crime. Over the past three years, she has fought

hard to overcome her trauma history, address her drug addiction, and become a productive member of society.

## I. Childhood trauma

Growing up in rural Tennessee, Brandie Appleton's material needs were met, but her childhood was marked by ample trauma and disfunction. Her mother, Theresa Jones, was severely addicted to opiate pills. (PSR at ¶ 61.) Ms. Appleton and her older sister both remember frequently finding their mother passed out on the toilet. (*Id.*) When Ms. Appleton was in second and third grade, she and her sister were responsible for getting Ms. Jones into bed at night and feeding her warm milk when she took too many pills. (*Id.*) Opiate abuse was rampant in the family and community. Extended family members used to carpool to the pain clinics to re-up their supplies.

Brandie Appleton's home environment was further complicated by the tumultuous relationship between her mother and her father. They divorced and reunited twice before separating for good when Ms. Appleton was 17. (*Id.* at ¶ 56.) Ms. Appleton witnessed frequent verbal and physical abuse between her parents, and she recalls that her mother was usually the aggressor. (*Id.* at ¶ 59.)

When Ms. Appleton was about seven years old, her parents divorced for the first time. Her mother, who was 30, remarried to a 19-year-old boy, and Brandie and her father moved in with her paternal grandmother. (*Id.* at ¶ 57.) While they were living in the grandmother's home, the house burned to the ground, destroying

2

all their belongings. (*Id.* at ¶ 62.) At around the same time, Ms. Appleton began suffering molestation by an older cousin during her weekend visits with her mother. (*Id.* at ¶ 60.) The sexual abuse lasted for three years and grew progressively worse. When Ms. Appleton finally disclosed that she had been raped, her parents decided to simply keep the cousin away from her rather than call law enforcement or take her to therapy. (*Id.*) At age 11, she was left to process the sexual abuse on her own.

When she was 13 years old, Brandie Appleton became pregnant, and she then suffered a traumatic miscarriage. (*Id.* at ¶ 70.) Because she was several months into the pregnancy, the miscarriage was bloody and painful. She endured the miscarriage at home and still remembers her horror at seeing the expelled fetus. Afterwards, Ms. Appleton's mother took her to the hospital, where she was prescribed Percocet for the pain. Her mother took most of the pills herself, but she doled out one dose to young Ms. Appleton – and that changed everything.

Ms. Applewood vividly remembers that first dose of Percocet. It was wonderful. For the first time, she felt happy and calm and at peace. She could ignore the trauma and anxiety of her life. She "fell in love" with opiates and began using them whenever she could. Ms. Appleton spiraled into addiction, and she has struggled with her opiate use since she first began using at age 13. (*Id.* at ¶ 80.)

In her senior year, Ms. Appleton dropped out of high school. (*Id.* at ¶ 87.) Although she returned to school to earn her GED, the pills were taking over her life as she began to use more and more. (*Id.* at ¶ 88.) Inevitably, with the increased drug

3

use came brushes with the law. In the span of one year, when she was 18 and 19 years old, Ms. Appleton was arrested six times and received four separate probation sentences. (*Id.* at ¶ 35-38.)

When Ms. Appleton was 20, she married Randall Appleton and pulled her life together. (*Id.* at ¶ 64.) When she was with her husband, Ms. Appleton stopped abusing opiates, stopped breaking the law and started recovering from her childhood trauma. But less than two years into the marriage, Brandie Appleton came home to find Randall dead. (Ex. 1, Obituary for Randall Appleton.) He was dangling from the rafters in their attic, where he had hung himself. And her life fell apart again.

In the wake of her husband's suicide, Brandie Appleton spun out of control. Unable to fully function, she violated probation in all four of her cases. The sentences were put into effect, and she was sent to prison for two years. (PSR at ¶ 35-38.)

## II. The instant offense

In April 2021, Brandie Appleton was deep in the throes of her addiction. Desperate for drugs, she broke into the Sutton Family Pharmacy to steal pills. She was accompanied by her co-defendant, Matthew Brummitt. He grabbed some gun receivers and boxes of ammunition, while she gathered up as many pill bottles as she could. (*Id.* at ¶ 14.) The pair were stopped by police within minutes of leaving the store. Upon searching the car, police officers found the stolen items, clothing

4

that had been used for a disguise, and an old shotgun "in a case in the far back area" of the vehicle. (*Id.* at ¶ 12.) The shotgun was not utilized in any manner during the burglary of the store, and neither defendant has claimed possession of it. The stolen ammunition did not fit the old shotgun.

### III. Rehabilitation

After a short time in custody, Brandie Appleton made bond and began the arduous work of rebuilding her life. She enrolled in the Bradford Health residential drug program and successfully graduated. (*Id.* at ¶ 82.) She also completed the Evolve Partial Hospitalization program and followed up with their Intensive Outpatient treatment. (Ex. 2, Letter from Evolve.) She moved into a sober living facility in Clarksville, and eventually helped open a new house that allowed children. (Ex. 3, Letter from Oxford House). She signed up for suboxone treatment in order to ensure that she remained sober, and she returned to therapy to address her history of trauma. (PSR at ¶ 83.)

Ms. Appleton was arrested in January 2022 on the federal arrest warrant for this case. She was living in the Blue Angels Oxford House sober living facility at the time. (Ex. 3.) The Court released Ms. Appleton on the condition that she return to the Blue Angels home and maintain her sobriety. (D.E. 19.) Ms. Appleton remained living in a sober living facility until the Court allowed her to move into her own place several months later. (D.E. 44.) For the past two and a half years that she has been on pretrial supervision, Ms. Appleton has scrupulously followed all the

5

Case 3:22-cr-00013  Document 98  Filed 05/08/24  Page 5 of 19 PageID #: 237

conditions of her release. (PSR at ¶ 8.) She has never once failed a drug test, she has maintained full time employment, and she has complied with every directive from her pretrial officer. (*Id.*)

Ms. Appleton now lives independently in Lewisburg and works as many hours as she can get. In November 2022, she began employment at the Lewisburg McDonald's, and she has worked her way up to manager. Ms. Appleton takes her job very seriously, and many of her co-workers have submitted letters in support of her. (Ex. 4, Co-worker letters.) Brandie Appleton's co-workers describe her as a "very hard working" manager who "goes above and beyond." (*Id.* at 1, 3, 4.) She is "very kind" and a "reliable" friend and co-worker who goes out of her way to help others. (*Id.* at 1, 2, 4, 5.)

Ms. Appleton has not used drugs since her arrest in April 2021. This extended period of sobriety has not been easy, as she has been going through extremely stressful litigation related to the custody of her middle child, Briella Frank.[1] Shortly before Ms. Appleton's arrest in 2021, Briella was removed from her custody by DCS through a neglect petition. The neglect accusation stemmed from Ms. Appleton's admission of drug abuse. Ever since her release from jail, Ms. Appleton has worked tirelessly to regain custody of Briella. Ms. Appleton has

---

[1] It is anticipated that attorney Ryan Duggers will testify at the sentencing hearing regarding the complicated details of the child custody case. Assistant U.S. Attorney Rachel Stephens has been apprised of the anticipated testimony and has no objections.

6

fulfilled every requirement imposed by DCS, and it appeared that the agency was going to agree to send Brielle home. But at the last minute, the foster family unexpectedly filed to permanently terminate Ms. Appleton's parental rights so that they could adopt her child. Ms. Appleton has been fighting the termination for the past two years. After multiple days of testimony, the family court judge is now waiting until after Ms. Appleton's federal sentencing to issue a final decision as to the termination of parental rights. Despite her fear about losing her child and the extreme stress of the litigation process, Ms. Appleton has remained dedicated to her sobriety and stayed on the right path.

## ARGUMENT

Brandie Appleton's federal conviction relates directly to her severe drug addiction and compulsion to obtain more pills. Given her childhood and early-life experiences, Ms. Appleton's substance abuse problem seems almost inevitable. But she has now turned her life around. Due to her extraordinary rehabilitation and her dedication to fighting for her child, Ms. Appleton respectfully requests a non-custodial sentence. Sending Ms. Appleton to prison would cause more harm than good and is a greater sentence than necessary under the requirements of 18 U.S.C. § 3553(a).

7

## I. History and characteristics and nature of the crime, 18 U.S.C. § 3553(a)(1)

Courts have long recognized that a defendant's difficult childhood is a mitigating factor at sentencing. *See, e.g.*, *California v. Brown*, 479 U.S. 538, 545 (1987) (O'Connor, J., concurring) (explaining that "evidence about the defendant's background and character is relevant [in death penalty case] because of the belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background, or to emotional and mental problems, may be less culpable than defendants who have no such excuse"). Adverse childhood experiences and mental health issues are factors to consider pursuant to 18 U.S.C. § 3553(a), because they affect both the nature and circumstances of the offense and the history and characteristics of the defendant. *United States v. Anderson*, 547 F.3d 831, 832 (7th Cir. 2008).

### A. Childhood trauma

The negative experiences in Ms. Appleton's childhood undoubtedly affected her trajectory as an adult. Chronic stressors such as abuse and neglect change the parts of a child's brain that are responsible for learning and processing of stress and emotion.[2] Childhood trauma has "negative impacts on those parts of the brain

---

[2] *See* University of Wisconsin-Madison, *Early Life Stress Can Leave Lasting Impacts on the Brain*, ScienceDaily (June 27, 2014), available at http://www.sciencedaily.com/ releases/2014/06/140627133107.htm.

associated with executive functioning skills such as selective attention and effortful control." Janet R. Shapiro and Jeffrey S. Applegate, *The Neurodevelopmental Impact of Stress, Adversity, and Trauma*, Neurobiology for Clinical Social Work (2018), at p. 92-117. As a child, Ms. Appleton endured the rampant drug use by her mother, the three years of sexual abuse, the trauma of a violent miscarriage, and the violence between her parents. "Witnessing even just verbal abuse between caregivers as a part of [domestic violence], without physical violence, can have observable impacts on the developing brain." Isabelle Mueller and Ed Tronick, *Early Life Exposure to Violence: Developmental Consequences on Brain and Behavior*, Front. Behav. Neurosci, (July 9, 2019).[3] On top of the traumatic incidents, Ms. Appleton frequently moved between homes due to her parents' volatile relationship, and she twice lost her home to fires. She lacked access to a stable and nurturing environment in which to heal from her experiences.

### B. Mental health

Ms. Appleton's mental health history is another factor for the Court to consider under 18 U.S.C. § 3553(a)(1)(A). *See Anderson*, 547 F.3d at 832, *see also* Evidence of mental illness is "relevant to crafting a just sentence" under §3553(a). *United States v. Robinson*, 778 F.3d 515, 523 (6th Cir. 2015). Over the past 15 years, Ms. Appleton has been diagnosed with multiple mental health problems,

---

[3] Available at https://www.frontiersin.org/articles/10.3389/fnbeh.2019.00156/full

9

Case 3:22-cr-00013   Document 98   Filed 05/08/24   Page 9 of 19 PageID #: 241

including bipolar disorder, anxiety disorder, and ADHD. (PSR at ¶ 75-77.) Although she has received sporadic medication and counseling, she has never had access to sustained mental health treatment. In large part, she has managed the effects of her mental illness on her own.

### C. Substance abuse

Ms. Appleton's childhood struggles contributed significantly to her eventual drug addiction. A person's environment, including "sexual abuse, early exposure to drugs, stress, and parental guidance can greatly affect a person's likelihood of drug use and addiction." Sara Gordon, *The Use and Abuse of Mutual-Support Programs in Drug Courts*, Ill. L. Rev., 1503, 1508 (2017). Like other diseases, alcoholism and drug abuse are influenced in large part by someone's biology and tend to run in families. *Id.* Ms. Appleton, with her history of family drug addiction, early exposure to drugs, and experience of sexual abuse, checks every box on the list of risk factors. Her drug addiction is not a choice or a moral failing, but rather a chronic disease sparked by both environmental and genetic factors.

Ms. Appleton's addiction is a relevant factor at sentencing because it pertains to both her history and characteristics and the nature and circumstances of the offense. 18 U.S.C. § 3553(a)(1). When Ms. Appleton burglarized the Sutton Pharmacy in April 2021, she was deep in the throes of her addiction. By stealing prescription pills from the store, she hoped to have enough pills for her own use, and some left over to share, sell, or trade. Her need for drugs led her to commit the

10

crime. Brandie Appleton's long-standing struggle with opiate abuse, and the addiction's genesis in the trauma of her youth, are grounds for a substantial downward variance.

## II. The advisory guidelines recommendation, 18 U.S.C. § 3553(a)(4)

### A. Criminal history category VI overstates Ms. Appleton's record

Brandie Appleton's history and characteristics relate not only to the § 3553(a) factors, but also to her criminal history category under the guidelines. The Presentence Report correctly assigns 13 Criminal History points to Ms. Appleton, placing her in Criminal History Category VI (CHC VI). This designation vastly overstates Ms. Appleton's criminal history. When viewed in the context of her life events, her criminal record looks much less concerning.

Eight of the 13 points are based on criminal activity that occurred during a ten-month period when Ms. Appleton was still 18 to 19 years old. Between December 2012 and September 2013, Ms. Applewood was charged in four separate incidents, each of which was resolved for a non-custodial sentence. Society now recognizes "that young adults between the ages of eighteen and twenty-one are mentally more like children than adults." *United States v. Sherrill*, 973 F.3d 752, 774 (6th Cir. 2020). It has become commonly understood that the physical brains of adolescents and young adults are not fully formed. Youth are categorically less

11

culpable than adults due to this lack of maturity and self-control.[4] Due to her ADHD, Ms. Appleton's brain was likely even more undeveloped than those of her peers. Neurocognitive development is typically complete by age 25, but individuals with ADHD typically lag about two years behind their peers.[5] Given what we now know about the slow maturation of brains, it does not seem just to apply eight criminal history points for behavior occurring when Ms. Appleton was still a teenager.

Those eight points become further indefensible when one looks at the nature of the crimes. A first-degree homicide conviction merits three points, but Ms. Appleton receives almost triple that for the following:

1. Shoplifting $90 worth of merchandise from Walmart;

2. Using two of her mother's checks without permission, for a total amount of $80;

3. Simple possession of a controlled substance; and

4. Driving under the influence and recklessly causing injury to her passenger.

(PSR at ¶ 35-38.) While the vehicular assault caused real damage, each of these crimes is indicative of a misdirected young woman making immature choices, not a

---

[4] *See Roper v. Simmons*, 543 U.S. 551, 569-70 (2005); Elizabeth Scott, Natasha Duell, and Laurence Steinberg, *Brain Development, Social Context and Justice Policy*, Washington U. J. of L. and Pol'y (2018).
[5] P. Shaw et al., *Attention-deficit/hyperactivity disorder is characterized by a delay in cortical maturation,* Proceedings of the Nat'l Acad. of Sciences (2007) available at https://www.pnas.org/content/104/49/19649.

12

"criminal" trying to cause harm. These crimes arise from or are consistent with Ms. Appleton's opiate addiction, which was in full swing at the time. *See, e.g.*, *United States v. Moore*, 2007 WL 1728667, at *3 (E.D. Wis. June 13, 2007) (granting a variance, in part, because defendant's prior convictions all stemmed from his drug addiction and his criminal history score and thus overstated the seriousness of his record).

Several of the eight points resulted from probation violations on the original non-custodial sentences – but these violations were imposed during a period when the local probation system was functioning in an illegal manner. A class action lawsuit, *McNeil v. Community Probation Services*, alleged "systemic constitutional and statutory violations in Giles County, Tennessee, which contracted with two for-profit companies." (Ex. 5, Consent Decree, 1:18-cv-00033, docket entry 463.) The consent decree in the suit found that the privately-run probation companies had a financial conflict of interest and that, "as a matter of policy," the companies demanded inappropriate payment of fees and extended the periods of probation. Ms. Appleton was a member of the class in *McNeil* and received a settlement of around $1,000 from the suit. She should not now be penalized for the suspect violations of her probation sentences in Giles County.

After the four convictions and eight points accrued in 2012 to 2013, Ms. Appleton did not receive more criminal charges until the end of 2015 – when she melted down after finding her husband dead in their home. Randall Appleton hung

13

himself on October 30, 2015. (Ex. 1.) A week later, Brandie Appleton was arrested for public intoxication at the funeral. (PSR at ¶ 39.) Two weeks after that, she was arrested for disorderly conduct. (*Id.* at ¶ 40.) In December, she was arrested for driving without a license, and then she missed a court date in early January. (*Id.* at ¶ 41, 42.) Due to the new charges (and her inability to pay), Ms. Appleton's probation officer filed a violation on the vehicular assault case. In March, Ms. Appleton pled guilty to the driving and failure to appear charges when her three-year probation sentence was put into effect. The convictions for driving without a license and missing court earned Ms. Appleton an additional four criminal history points under the Guidelines. These points are excessive due to the minor nature of the crimes and the context of Ms. Appleton's grief.

As the highest possible level, Criminal History Category VI should be reserved for the "worst of the worst," not applied to non-violent individuals like Brandie Appleton. Even pre-*Booker*, courts were authorized to depart downward when the criminal history category significantly over-represented the seriousness of a defendant's criminal history or the likelihood that the defendant would commit further crimes. *United States v. Fletcher*, 15 F.3d 553, 556 (6th Cir. 1994) (citing U.S.S.G. § 4A1.3). Ms. Appleton has only one reckless-intent felony, for which she originally received probation. She has no convictions for violent crimes. Most of her charges are for minor crimes, and all her convictions relate back to her struggles with drug abuse. Given Ms. Appleton's rehabilitation and sobriety, her record

14

himself on October 30, 2015. (Ex. 1.) A week later, Brandie Appleton was arrested for public intoxication at the funeral. (PSR at ¶ 39.) Two weeks after that, she was arrested for disorderly conduct. (*Id.* at ¶ 40.) In December, she was arrested for driving without a license, and then she missed a court date in early January. (*Id.* at ¶ 41, 42.) Due to the new charges (and her inability to pay), Ms. Appleton's probation officer filed a violation on the vehicular assault case. In March, Ms. Appleton pled guilty to the driving and failure to appear charges when her three-year probation sentence was put into effect. The convictions for driving without a license and missing court earned Ms. Appleton an additional four criminal history points under the Guidelines. These points are excessive due to the minor nature of the crimes and the context of Ms. Appleton's grief.

As the highest possible level, Criminal History Category VI should be reserved for the "worst of the worst," not applied to non-violent individuals like Brandie Appleton. Even pre-*Booker*, courts were authorized to depart downward when the criminal history category significantly over-represented the seriousness of a defendant's criminal history or the likelihood that the defendant would commit further crimes. *United States v. Fletcher*, 15 F.3d 553, 556 (6th Cir. 1994) (citing U.S.S.G. § 4A1.3). Ms. Appleton has only one reckless-intent felony, for which she originally received probation. She has no convictions for violent crimes. Most of her charges are for minor crimes, and all her convictions relate back to her struggles with drug abuse. Given Ms. Appleton's rehabilitation and sobriety, her record

14

indicates little risk of her committing further crimes. Criminal History Category VI vastly over-represents Ms. Appleton's criminal history, so a significant downward variance should be applied.

### B.  U.S.S.G. § 2D1.1 more appropriately suits the crime

Brandie Appleton's primary crime was burglarizing the pharmacy to get access to pills. The ammunition at issue in Count Four was carried out of the store by co-defendant Matthew Brummit and is incidental to Ms. Appleton's actions. It makes more logical sense for the drugs, not the ammunition, to drive the Guidelines calculations. Under U.S.S.G. § 2D1.1, the section devoted to drug crimes, Ms. Appleton's adjusted offense level would be 16, rather than the 18 assigned under U.S.S.G. § 2K1.1. (PSR at n.2.) After taking "acceptance of responsibility" into account, the total offense level would be 13.

### III.  The seriousness of the offense, deterrence, and treatment, 18 U.S.C. § 3553(a)(2)

Ms. Appleton has not used illicit drugs since April 16, 2021, the date of her arrest for this crime. (PSR at ¶ 80.) In the past three years, she has passed every drug test and complied with all conditions of her pretrial release. Her three years of complete sobriety prove that she can, and will, avoid any future criminal activity. Ms. Appleton's crime arose from her opiate addiction. As an addict, Ms. Appleton is more amenable to treatment and rehabilitation. Patricia H. Brown, *Considering Post-Arrest Rehabilitation of Addicted Offenders Under the Federal Sentencing*

15

*Guidelines*, 10 Yale L. & Pol'y Rev. 520, 523 n.22 (1992) ("The stronger the connection between the crime and the addiction, of course, the stronger the argument for consideration of rehabilitation from addiction as a relevant factor at sentencing."). Her commitment to sobriety demonstrates the low risk of her recidivism. Additionally, her track record of sobriety shows that she does not need further training or treatment in a BOP facility. A BOP sentence would not provide any additional beneficial programing for Ms. Appleton.

Ms. Appleton's offense was undeniably serious, as reflected by its classification as a felony. Indeed, the prosecution of this case has saddled her with two federal felony convictions. Yet the applicable statutes clearly allow for a noncustodial sentence, which is appropriate in her case because the crime was driven by an addiction she incurred as a severely-abused youth and because, following the crime, she has behaved so admirably and has made so much progress against her addiction. In such circumstances, society's need for retribution can be fully satisfied by a noncustodial sentence. *Gall v. United States*, 552 U.S. 38 (2007) (endorsing sentence of three years of probation for nonviolent drug offender with substantial post-offense rehabilitation); *United States v. Baker*, 502 F.3d 465 (6th Cir. 2007) (affirming sentence of probation for firearms offense partly because defendant did very well on pretrial release).

## IV. The kinds of sentences available, 18 U.S.C. § 3553(a)(3)

"§ 3553(a)(3) directs the judge to consider sentences other than imprisonment." *Gall*, 552 U.S. at 59. Any defendant "who has been found guilty of an offense may be sentenced to a term of probation" unless they fall into one of the categories listed in 18 U.S.C. § 3561(a). Ms. Appleton clearly qualifies for a non-custodial sentence under the framework of the sentencing statutes. The Court has a wide array of tools at its disposal in crafting an alternative to prison. Probation is an option, as is a time-served sentence with three or six years of supervised release. The Court can also utilize home confinement, mandatory residence at a halfway house, and community service.

## V. A custodial sentence would be counterproductive

Ms. Appleton has made so much progress in the last three years: she has remained drug-free; she has gotten the treatment she needs; and she is thriving in a full-time job. Plus, she is fighting to regain custody of her daughter. Sending her to prison for even a brief period would be counter-productive; while she is already firmly on a rehabilitative track, incarceration would knock her off that track and would re-expose her to bad influences. The Supreme Court has noted that probation can be so effective precisely because it "take[s] advantage of an opportunity for reformation which actual service of the [custodial] sentence might make less probable." *Berman v. United States*, 302 U.S. 211, 213 (1937); *cf. Brown v. Plata*, 563 U.S. 493, 535 n.10 (2011) (referring to studies showing the California prisons

17

were "criminogenic" in that they tended to produce, rather than deter, criminal behavior in people subject to incarceration). Additionally, a prison sentence would likely result in the permanent termination of Ms. Appleton's parental rights for Briella. Incarcerating Ms. Appleton would probably cause her, her children, and society, more harm than good.

## CONCLUSION

In light of her extremely traumatic youth, her truly impressive rehabilitation over the last three years, and the Guidelines' gross overstatement of her criminal history, Brandie Appleton respectfully asks that the Court vary downward to impose a noncustodial sentence, perhaps including a term of home confinement. Ms. Appleton takes full responsibility for her actions and will accept any punishment the Court metes out, but she asks for a non-custodial sentence so that she may continue fighting for her child and learning to live a healthy and productive life.

Respectfully submitted,

/s/ Mary Kathryn Harcombe
MARY KATHRYN HARCOMBE
BPR# 024466
Assistant Federal Public Defender
810 Broadway, Suite 200
Nashville, TN 37203
615-736-5047
E-mail: MaryKathryn_Harcombe@fd.org

Attorneys for Brandie Nicole Appleton

18

## CERTIFICATE OF SERVICE

I hereby certify that on May 8, 2024, I electronically filed the foregoing *Sentencing Memorandum for Brandie Appleton* with the clerk of the court by using the CM/ECF system, which will send a Notice of Electronic Filing to the following: Rachel M. Stephens, Assistant United States Attorney, 719 Church Street, Suite 3300, Nashville, TN 37203; copy to Heather Holland, United States Probation Office, 719 Church Street, Suite 1100, Nashville, TN 37203.

/s/ *Mary Kathryn Harcombe*
MARY KATHRYN HARCOMBE